UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-10661-GAO

DAVID GRANT, JR.,
Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner, Social Security Administration,
Defendant.

OPINION AND ORDER
September 23, 2011

O'TOOLE, D.J.

## I.     Introduction

The plaintiff, David Grant, Jr., appeals the denial of his application for Social Security

Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits by the

Commissioner of the Social Security Administration ("Commissioner"). Grant applied for SSDI

and SSI benefits on June 20, 2007, claiming he became disabled as of October 31, 2006.

(Administrative Tr. at 91, 116 [hereinafter R.].) His claim was denied at the initial level of

review on August 2, 2007. (Id. at 44.) A Federal Reviewing Official confirmed the denial in a

decision dated June 25, 2008. (Id. at 37.) Grant timely filed a written request for a hearing before

an Administrative Law Judge ("ALJ") on August 28, 2008. (Id. at 54.) Prior to the hearing, Grant

amended his claim to a closed period of disability from October 31, 2006 to April 21, 2008,

when he returned to work. (Id. at 82.)

The hearing was held on November 9, 2009. (Id. at 17.) On November 17, 2009, the ALJ

issued a written decision finding that Grant should be denied SSDI and SSI benefits because

although he could no longer perform his past relevant work, there were other jobs he could perform. (<u>Id.</u> at 14.) The Decision Review Board declined to overturn the ALJ's decision, and it became the final decision of the Commissioner. (<u>Id.</u> at 1.) Grant filed a timely appeal, pursuant to 42 U.S.C. § 405(g).

Before the Court are cross-motions to reverse, or alternatively to affirm, the decision of the Commissioner. The Court now affirms the ALJ's decision because there is substantial evidence in the administrative record to support it and no error of law was made.

## II.    Factual Background

At the time he applied for SSDI and SSI benefits, Grant was forty-two years old. (<u>Id.</u> at 91.) He has a high school education. (<u>Id.</u> at 122.) For the twelve years prior to his stroke, he worked as an electrician. (<u>Id.</u> at 117.) The vocational expert who testified during the administrative hearing indicated that this work was medium and skilled in nature. (<u>Id.</u> at 14.)

On October 31, 2006, while he was driving, Grant suffered an acute left medial cerebral artery stroke with possible focal seizures, causing a minor motor vehicle accident. (<u>Id.</u> at 168, 171, 173, 185, 711.) The rescue team found Grant to be minimally responsive with facial droop, left-sided shaking, and diminished or absent motor and sensory signs on the right side. (<u>Id.</u> at 155, 185, 222, 282.)

Grant was taken to Rhode Island Hospital following his stroke. (<u>Id.</u> at 156, 168, 173.) Head CTs, (<u>id.</u> at 290, 304, 523, 528-29), a brain MRI, (<u>id.</u> at 521), and a transcranial Doppler examination, (<u>id.</u> at 534) showed acute thrombosis and middle cerebral artery infarct. (<u>Id.</u> at 524.) A transesophageal ephocardiogram showed an interatrial septum aneurysm with patent foramen ovale. (<u>Id.</u> at 508.) Grant underwent a thrombectomy to remove the blood clots that had

formed. (Id. at 156, 168, 524-27.) He was treated afterwards with anti-coagulant and anti-seizure medication. (Id. at 156.)

Grant suffered from seizures, (id. at 1255, 1347), muscle spasms, (id. at 177, 214, 367, 471), and a pulmonary embolism, (id. at 168, 174, 295, 332), while he was recovering from surgery. An electroencephalogram performed on November 6, 2006, revealed no definite epileptiform features but showed signs of a left anterior quadrant abnormality. (Id. at 506.) At this time, Grant was noted to be recovering "remarkably well" through his speech, physical, and occupational therapy. (Id. at 174.)

During physical therapy on November 7, 2006, Grant became acutely hypoxic and was diagnosed with a large saddle pulmonary embolus. (Id. at 168, 174, 295, 298.) The embolus was revealed by CT scan to extend into the major lobar branches of both of his lungs as well as to some segmental branches. (Id. at 298, 572.) Grant was admitted into the intensive care unit as a result of the pulmonary embolism. (Id. at 352.)

Grant stayed in intensive care until November 12, 2006. (Id. at 174-175.) He was noted after leaving the unit to be regaining function with his right side, to have a capacity of four-fifths of his original strength, and to have intact cranial nerves and intact bilateral sensory examination. (Id.) On November 14, 2006, Grant's speech therapist noted that he was able to answer yes or no questions and to follow simple commands but had difficulty with two-to-three step commands. (Id. at 204.) The speech therapist found Grant to have moderately severe expressive aphasia. (Id. at 205.) Grant's occupational therapist noted that Grant's fine motor coordination remained moderately limited. (Id. at 182.) Grant had been feeding himself with his left hand due to the greatly increased time it took to feed himself with his right hand without spilling food. (Id.)

Grant was not permitted to drive a car or return to work but was allowed supervised ambulation, showering, housework, stair climbing, and lifting up to five pounds. (Id. at 179)

Grant was discharged from Rhode Island Hospital on November 20, 2006. (Id. at 177.) He was admitted to Spaulding Rehabilitation Hospital shortly thereafter for additional inpatient speech and physical therapy. (Id. at 630.) He continued taking anti-coagulation and anti-seizure medication and enrolled in the Comprehensive Multidisciplinary Rehabilitation Program, a program assisting recovery in independent functional household utility and self-care activities with moderate assistance for communication. (Id. at 633.) While at Spaulding, Grant met with Dr. Sarah Gibson, who noted significant spasm and pain in Grant's right arm, persisting over two days. (Id. at 661-62, 666.) Grant's aphasia also appeared to be partially related to his anxiety. (Id. at 631, 668.) On neurology follow-up, Dr. MingMing Ning noted that Grant's anti-coagulation medication might be related to his spasms and prescribed alternative medication. (Id. at 679, 681.)

Upon discharge, clinical neuropsychologist Jeffrey Sheer found that Grant had reduced dexterity in his right hand, moderate difficulty holding a pencil, mild residual weakness in his right leg, and nonfluent speech secondary to aphasia. (Id. at 634.) Grant's most serious difficulties were with his speech; his performance on executive functioning tests was in some respects severely impaired, and he also had severe difficulties with verbal expression and learning tasks. (Id. at 634-37.) Physically, Dr. Randi Black-Schaffer described Grant as independent for gait of up to 1000 feet and for dressing and bathing, but still to be suffering from moderate speech impairment. (Id. at 631.)

Grant enrolled in a physical and occupational therapy course at Morton Hospital on December 11, 2006. (Id. at 701.) After five visits, he was noted by his therapist to have improved strength and balance, although he walked with a slight limp. (Id.)

Grant met with Dr. J. Donald Easton for a neurological consultation on December 21, 2006. (Id. at 711-12.) Dr. Easton found that Grant was conversant but had prominent speech hesitation, considerable difficulty naming common objects and body parts, and moderately impaired repetition skills. (Id.) Dr. Easton noted that physically, Grant had recovered four-fifths of his full strength and still had some clumsiness on the right side. (Id.)

Grant met with Dr. Ravithara Krishnadasan at Rhode Island Hospital for hematology evaluation on January 8, 2007. (Id. at 704-05.) Testing showed elevated factor VIII levels, mild right-sided weakness, and difficulty with speech. (Id. at 706.) Dr. Krishnadasan recommended surgical closure of the patent foramen ovale or indefinite anti-coagulation medication. (Id.)

Grant met with Dr. Igor Palacios for a cardiological examination on April 20, 2007. (Id. at 1347.) Dr. Palacios found that Grant was nearly eighty percent back to normal condition in clinical terms, with only very minimal dysarthria. (Id. at 1347-48.)

Grant met with Dr. Beth Leeman, an epilepsy specialist, to gain assistance in weaning himself off his anti-coagulation medication on May 4, 2007. (Id. at 1255-56.) Dr. Leeman found that Grant had some numbness in his right arm and leg, weakness, and decreased sensation. (Id.) Dr. Leeman also observed that Grant had right pronator drift, a brisk reflex in his right bicep, distonic posturing of the right upper extremity when performing complicated movements, and a steady narrow-based gait with intact tandem gait. (Id.) Grant had speech problems, including difficulty with "get[ting] his words out" and occasional paraphasias, but was able to follow

commands. (Id.) Because of Grant's two seizures six months prior in November of 2006, Dr. Leeman noted that Grant had an increased risk of epilepsy. (Id.)

Two weeks later on May 16, 2007, Grant was admitted to Massachusetts General Hospital to undergo surgery with Dr. Palacios to close the patent foramen ovale. (Id. at 752, 760-61, 1069.) Grant stated that at this time, he had fatigue in the morning, (id. at 753), some right side weakness, (id. at 760, 1072), blurred vision in his right eye, (id. at 770), and feelings of depression, (id. at 764). On examination, Dr. Palacios noted that Grant's right side had improved to full strength, and that Grant now had equal planar flexion and no drift. (Id. at 753.) The patent foramen ovale was successfully closed with a Cribiform ASD Amplatzer device through surgery. (Id. at 752, 762, 1072, 1075.) Grant was discharged on May 17, 2007. (Id. at 753-55.) He was instructed to limit his lifting to fifteen pounds and to participate in only brisk walking for the following six weeks. (Id. at 802.)

Grant was given permission by Spaulding Rehabilitation on June 4, 2007 to take a road test to regain his driver's license because he now had recovered his functional movement, coordination, and strength. (Id. at 813-16.) Grant did well on both mental and visual driving tasks during his pre-driving assessment. (Id.) Grant had been independent for all daily activities and was walking twenty minutes per day at this time. (Id. at 845.)

On June 7, 2007, Grant was taken to Morton Hospital's emergency room with chest pain, (id. at 824), and shortness of breath, (id. at 826), and was then transferred to Massachusetts General Hospital, (id. at 835, 842, 1092). On admission to the hospital he had pain in his ribs on his right side, difficulty taking breaths, and pressure on the left side of his head. (Id. at 845.) A Pelvic Magnetic Resonance Venography revealed that Grant had suffered another pulmonary embolism with deep venous thrombosis. (Id. at 830, 844-46, 1085.) Grant was treated with anti-

coagulants by Dr. Palacios and underwent surgery on June 9, 2007 for a temporary inferior vena cava filter to be implanted. (<u>Id.</u> at 846.)

Grant experienced a ten-second episode of staring and unresponsiveness that was observed by his neurologist, Dr. Ning, on June 10, 2007. (<u>Id.</u> at 846, 1083.) Grant reported that he felt doped and that his right arm felt like it was shaking. (<u>Id.</u>) Dr. Leeman, the epilepsy specialist, believed that this episode was caused by a complex partial seizure arising from irritated tissue around the site of Grant's cardiovascular problems. (<u>Id.</u> at 847, 921-22.) Within two days, Grant's pain had resolved. (<u>Id.</u> at 846.) He underwent a physical evaluation and had a normal muscle performance, range of motion, balance, and he also could independently walk again. (<u>Id.</u> at 913-14.) He was discharged from Massachusetts General Hospital on June 14, 2007. (<u>Id.</u> at 842.) He was restricted to lifting only ten pounds at most for the next three weeks. (<u>Id.</u> at 883.)

Grant met with Dr. Ning for a follow-up visit on June 22, 2007. (<u>Id.</u> at 1355.) Dr. Ning found that Grant could name low-frequency words, repeat simple sentences, and follow three-step commands without difficulty. (<u>Id.</u>) Dr. Ning's physical observations were that Grant had right arm drift, "4+/5" proximal right leg strength and "5-/5" distal right leg strength, and a narrow-based gait with a slight dragging of the left foot and curling-in of the left hand. (<u>Id.</u>)

Grant met with Dr. Palacios for a follow-up visit on July 10, 2007. (<u>Id.</u> at 1098.) Dr. Palacios found that Grant no longer had cardiac, pulmonary, or neurological symptoms, and therefore the inferior vena cava filter which had been implanted on June 9, 2007 could be removed via surgery as soon as September, 2007. (<u>Id.</u> at 1260, 1263.) However, because Grant suffered from continued anti-coagulation control problems, (<u>id.</u> at 1298, 1305, 1311, 1314, 1317), despite Dr. Palacios findings, the surgery was subsequently postponed, (<u>id.</u> at 1365.)

Grant was taken to the Morton Hospital emergency room after experiencing severe abdominal pain on September 21, 2007. (Id. at 1201, 1206-08.) While staying in the hospital, Grant was observed having a grand mal seizure, lasting approximately thirty seconds in total. (Id. at 1206, 1258.) Grant was transferred to Massachusetts General Hospital. (Id. at 1208, 1240.) A full battery of testing came back negative for deep vein thrombosis or pulmonary embolisms. (Id. at 1209, 1214, 1216, 1234-38.) Grant was diagnosed with dysphasia of uncertain etiology, (id. at 1214), and discharged the next evening, September 23, 2007, (id. at 1209, 1218, 1220, 1252).

Grant met with Dr. Leeman at the epilepsy clinic on September 28, 2007. (Id. at 1258.) Dr. Leeman increased the dosage of his anti-seizure medication and forbid Grant from driving for six months at a minimum. (Id. at 1259.) Dr. Leeman found that physically, Grant had returned to almost entirely full strength, except for his finger extensors, which were rated by Dr. Leeman as "4+/5." (Id.)

Grant had a neurological follow-up visit with Dr. Ning on October 26, 2007. (Id. at 1267.) Dr. Ning noted that Grant was doing well and had no new signs of stroke. (Id.) His brain CT scan was consistent with his earlier middle cerebral artery infarct. (Id. at 1331.) Grant went to Massachusetts General Hospital for peripheral venous testing on November 16, 2007, which revealed deep venuous thrombosis in his right leg. (Id. at 1369.) It was assessed as most likely to be a chronic condition. (Id. at 1370.) An electroencephalogram of Grant on November 27, 2007, revealed no new problems. (Id. at 1326.)

Dr. Ning described Grant as doing "remarkably well" during a follow-up visit on February 1, 2008. (Id. at 1372.) At this point, Grant's speech was "much improved" even though he had residual paraphasic speech errors, and Grant was otherwise walking three miles a day and exercising. (Id.) Dr. Ning did not allow Grant, as Grant had requested, to return to work as an

electrician at this time, and Dr. Ning told Grant that Dr. Leeman would need to perform another MRI before Grant could go back to any work that required climbing or driving. (Id.)

The MRI was performed on March 14, 2008, and the results were positive. (Id. at 1327.) Grant stated during his examination with Dr. Leeman on the date of his MRI that he remained very active in his exercising. (Id.) Grant was able to speak fluently and could follow commands. (Id.) Furthermore, he had intact fine finger movements and finger-nose-finger testing. (Id.) He was also able to walk on his heels and his toes. (Id.) Dr. Leeman noted that Grant had not had a seizure for over six months and was now able to return to driving without restriction. (Id. at 1325.) She stated that Grant was "currently able to return to work," with the precaution that Grant had seizures in the past with normal MRIs. (Id.) Grant returned to work on April 21, 2008. (Id. at 82.)

A.      Department of Developmental Services Physician

A state agency physician, Dr. Walter Harrison, reviewed  Grant's medical records and made an assessment of Grant's residual function capacity on August 1, 2007. (Id. at 1193-1200.) Dr. Harrison found that as of that date, Grant was capable of performing light capacity work. (Id. at 1194.) Specifically, Dr. Harrison found that Grant could: lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday; sit with normal breaks for a total of about six hours in an eight-hour workday; and occasionally climb, balance, stoop, kneel, crouch, and crawl. (Id. at 1194-95.)

B.      Impartial Medical Expert

The ALJ called neurosurgeon Dr. Robert Dowben to testify as an impartial medical advisor at the November 9, 2009 hearing. Dr. Dowben noted that as of October 26, 2007, Grant

had normal muscle strength and sensory examination. (<u>Id.</u> at 24-26.) Dr. Dowben further testified that Grant suffered from nonconvulsive epilepsy until only "early 2007," and that Grant's significant and persistent aphasia and disorganization of motor function continued following his accident until only September 2007. (<u>Id.</u> at 26-28.)

Dr. Dowben testified that Grant had been "recovering very well" since his June 14, 2007 discharge from Spaulding. (<u>Id.</u> at 28.) Dr. Dowben gave his opinion that Grant would have reached his current (i.e., 2009) level of functioning between six and twelve months after his June 2007 discharge, gradually recovering more and more strength. (<u>Id.</u> at 28-29.) Dr. Dowben testified that physically exertion during the recovery period would have sped the recovery. (<u>Id.</u> at 29.) Importantly, Dr. Dowben agreed with the assessment of Dr. Harrison that Grant was capable of light capacity work as of August 1, 2007. (<u>Id.</u> at 30.)

C.     The ALJ's Decision

The ALJ found that Grant did not have a disability for the required twelve-month period. (<u>Id.</u> at 10.) She held that Grant had the residual functional capacity to perform light work as of August, 2007, less than a year after his injury. (<u>Id.</u> at 10-11.) The ALJ relied significantly on the assessments of Dr. Harrison, the non-reviewing state physician, and Dr. Dowben, the impartial medical expert who agreed with Dr. Harrison's findings, to reach her decision. (<u>Id.</u> at 13.) Although Grant testified that he felt he could not work at all until 2008, (<u>id.</u> at 21), the ALJ found that the contrary findings of Dr. Harrison and Dr. Dowben were consistent with Grant's "full regimen of self-care, housework, and exercise," even if Grant testified otherwise. (<u>Id.</u> at 14.)

## III.    Standard of Review

In reviewing a denial of SSDI and SSI benefits, the Court must uphold the ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g); Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001). The decision must be upheld when substantial evidence supports it even if the record could "arguably justify a different conclusion." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987). Deciding upon issues of credibility and drawing permissible inferences from evidentiary facts is the "prime responsibility" of the ALJ. Rodriguez v. Celebrezze, 349 F.2d 494, 496 (1st Cir. 1965). The ALJ is entitled to "piece together the relevant medical facts from the opinions and findings of multiple physicians." Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987). The ultimate conclusion as to whether the applicant is disabled is the final responsibility of the ALJ. 20 C.F.R. § 416.927(e)(1).

## IV.    Discussion

Grant raises three arguments for reversal of the Commissioner's decision. First, Grant contends that the ALJ's finding was not supported by substantial evidence; second, he argues that the ALJ erred in assigning significant weight to the opinion of a non-examining state agency physician; and third, Grant argues that the ALJ erred in finding his testimony to be not entirely credible.

### A.    Ground One

The ALJ's finding that Grant could perform light work within a year of the onset of his impairment is supported by substantial evidence in the record. To establish he was disabled, Grant needed to demonstrate that he was unable to work for "*at least 12* [consecutive] *months*." Barnhart v. Walton, 535 U.S. 212, 215 (2002); see 42 U.S.C. § 423(d)(1)(A), (d)(2)(A). Grant

only convinced the ALJ that he had been unable to work for about ten months. (R. at 10, 28.)
The ALJ based her conclusion substantially on the testimony of Dr. Harrison and Dr. Dowben,
who agreed that although Grant could not yet return to his job as an electrician foreman after ten
months, he could perform light work as of August 2007. (Id. at 13, 30, 1194-95.)

Grant argues that the ALJ ignored Dr. Dowben's testimony that six to twelve months
were necessary after each hospital discharge in order to attain full recovery. (Id. at 28.) He also
points out that Dr. Leeman did not grant permission for him to return to work until March 2008,
six months after his most recent hospital discharge. Furthermore, he argues that Dr. Dowben's
testimony is fully in line with Dr. Leeman's testimony that his return to work would take six
months at a minimum after his most recent hospitalization in September, 2007.

Grant's argument slightly mischaracterizes the evidence. Dr. Leeman wrote in April 2008
that Grant, having been seizure-free for six months, was able to return to work, referring to an
apparent provision of state law. (Id. at 1325.) Dr. Dowben's six-to-twelve-month rehabilitation
estimate was a projection, measured from Grant's discharge from the Spaulding Rehabilitation
Hospital in June 2007, but he also agreed that by August 2007, Grant had recovered the ability to
do at least light work. (Id. at 30.) TALJ's conclusion that Grant's disability had a duration of less
than a year was supported by substantial evidence and appropriately accounted for the objective
medical findings and medical opinions presented.

B.     Ground Two

Grant argues that the ALJ erred by assigning Dr. Harrison's report significant weight
because Dr. Harrison was a non-examining physician who did not look at the full medical file
before writing a short, conclusory statement. Berrios Lopez v. Sec'y of Health & Human Servs.,
951 F.2d 427, 431 (1st Cir. 1991) ("Such reports often contained little more than brief

conclusory statements or the mere checking of boxes denoting levels of residual functional capacity, and accordingly are entitled to relatively little weight.") As a non-examining physician, Dr. Harrison's report merits less prima facie credibility than treating and examining sources. <u>See</u> <u>Johnson v. Astrue</u>, 597 F.3d 409, 412 (1st Cir. 2009).

The ALJ explained that she was assigning significant weight to Dr. Harrison's opinion because it was consistent with both Dr. Dowben's testimony, Grant's own testimony, and the objective findings of Grant's treating sources as seen through their contemporaneously recorded treatment notes. <u>See</u> 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.") The ALJ may rely on reports submitted by non-testifying, non-examining physicians in certain circumstances. <u>Rose v.</u> <u>Shalala</u>, 34 F.3d 13, 18 (1st Cir. 1994). The Commissioner appropriately points out here that none of the numerous medical sources who treated Grant offered opinions contradicting that of Dr. Harrison. (Def.'s Mem. in Supp. of Mot. to Affirm 18 (dkt. no. 14).)

Grant raises the argument here that Dr. Harrison's opinion was inconsistent with the other physicians' testimony because Dr. Leeman determined that Grant was not fit to return to work until March of 2008. (R. at 13, 1325.) However, Dr. Leeman was referring to Grant returning to work as an electrician, not Grant's ability to perform light work. This is demonstrated by the fact that, as the ALJ noted, Grant met with Dr. Ning to discuss the possibility of returning to work as an electrician in February, 2008. (<u>Id.</u> at 13, 1372.) Dr. Ning told Grant that he could not return to work that *"would involve going up on ladders and driving"* until he had received a MRI. (<u>Id.</u> at 1372 (emphasis added).) Dr. Ning and Dr. Leeman never testified or contradicted Dr. Harrison and Dr. Dowben's findings regarding Grant's ability to perform less strenuous work.

Thus, the ALJ's decision according significant weight to Dr. Harrison's opinion was appropriate in light of the fact that his report was powerfully backed by other parts of the record. See 20 C.F.R. § 404.1527(d)(4).

C.     Ground Three

Grant's final argument is that the ALJ erred by disregarding testimony he gave about his fatigue and right-sided weakness that prevented him from performing light work. Grant correctly notes that it is essential for cognizance to be taken of a claimant's subjective symptoms. Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 23 (1st Cir. 1986). Grant argues that despite his doctors' assessments that he retained full grip strength and full capability in his right side, he still had continued weakness that doctors could not detect that prevented his return to work.

The ALJ did not err in her assessment of Grant's credibility. Credibility determinations are the province of the Commissioner and are entitled to deference. See Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991). Although the ALJ had to consider Grant's testimony in accordance with Avery, the ALJ is not required to accept all subjective testimony at face value and "may disregard subjective claims of pain if they are unsubstantiated and [the ALJ] does not credit them." See Mills v. Apfel, 244 F.3d 1, 7 (1st Cir. 2001); 20 C.F.R. § 416.929.

The ALJ appropriately found that Grant's subjective complaints were inconsistent with objective evidence and Grant's own daily activities, which as the ALJ noted in her decision, included performing a "full regimen" of household chores, walking three miles at least every other day, and exercising at the gym often. (R. at 14) Although Grant argues that any type of light work requires an individual perform physical and mental activities that are far beyond what he was able to perform, his subjective complaints were inconsistent with Dr. Harrison's and Dr.

Dowben's findings that Grant was fully capable of performing light work by August of 2007. (<u>Id.</u> at 30.) The ALJ did not err in her assessment of Grant's credibility.

**V.      Conclusion**

For the foregoing reasons, the plaintiff's Motion to Reverse the Decision of the Commissioner (dkt. no. 10) is DENIED, and the defendant's Motion to Affirm the Commissioner's Decision (dkt. no. 13) is GRANTED. The decision is AFFIRMED.

It is SO ORDERED.

   /s/ George A. O'Toole, Jr.
United States District Judge
